IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| ROBERT M. BOURNE, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 06-0293 |
| | : | |
| LANCASTER COUNTY PRISON, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**MEMORANDUM**

YOHN, J.                                                                    October __, 2009

      Plaintiff Robert M. Bourne sues the Lancaster County Prison ("LCP"), LCP Warden,

Vincent Guarini, and former LCP Mental Health Counselor, Troy Waltz, pursuant to 42 U.S.C.

§ 1983 and Pennsylvania law, seeking damages and other relief for alleged violations of his

rights during his incarceration at LCP.  For his § 1983 claims, plaintiff alleges that all three

defendants are liable because Waltz used excessive force against him and he was denied access

to outdoor exercise for a period of more than one hundred days, both in violation of his Eighth

Amendment right to be free from cruel and unusual punishment.  Plaintiff also asserts state law

claims for assault, battery, gross negligence/willful misconduct, intentional infliction of

emotional distress, and negligent infliction of emotional distress arising out of Waltz's use of

force against him.  Before the court are defendants' motion for summary judgment[1] and

plaintiff's response thereto.  For the reasons that follow, the motion will be granted in part and

denied in part.

## I.   Factual Background

In March 2005, plaintiff was incarcerated at LCP following his arrest on charges of

indecent assault of a person less than thirteen years of age and corruption of a minor.  (3d Am.

Compl. ¶¶ 10-11; Answer to Pl.'s 3d Am. Compl. ¶¶ 10-11; *see* Pl.'s Ex. A ("Pl.'s Dep.") 49.)

Plaintiff was convicted of the indecent assault charge in the Court of Common Pleas of Lancaster

County in December 2005 (Defs. Lancaster County Prison and Troy Waltz's Statement of

Undisputed Material Facts ("Defs.' Statement") ¶ 3; Pl.'s Counterstatement of Undisputed Facts

("Pl.'s Counterstatement") ¶ 3), and he remained at LCP for a period of time thereafter.

In March 2006, the Court of Common Pleas ordered plaintiff to undergo a psychiatric

evaluation and a pre-release sex offender assessment prior to being released on parole.  (Defs.'

Statement ¶ 8 & Ex. D (*Commonwealth v. Bourne*, No. 2149-05, Order (Ct. Com. Pl. Mar. 10,

2006)); Pl.'s Counterstatement ¶ 8.)  The Lancaster County Office of Special Offenders arranged

for Dr. Anthony Russo, who previously had worked as a psychiatric consultant for the Office of

Special Offenders, to perform the court-ordered psychiatric evaluation.  (*See* Defs.' Ex. E

("Russo Dep.") 12, 16-17.)  Although plaintiff met with Dr. Russo at LCP on April 16, 2006, as

---

[1]Although defendants' motion is captioned as a motion by defendants Waltz and LCP only, the supporting memorandum also makes arguments for summary judgment on behalf of defendant Guarini, who is represented by the same counsel as the remaining defendants.  (*See* Defs. LCP and Troy Waltz's Mem. of Law in Support of Their Mot. for Summ. J. ("Defs.' Mem.") 17-18.)  Accordingly, the court will construe the motion as having been filed on behalf of all three defendants.

scheduled, Dr. Russo was unable to perform the evaluation.  The parties' accounts of this meeting and its immediate aftermath differ markedly in several critical respects.

At his deposition, plaintiff testified that on the day of the evaluation, he arrived in the counseling room where Dr. Russo and defendant Waltz were waiting for him, entering through a door leading from the medical housing unit.  (Pl.'s Dep. 82-83, 85.)  At plaintiff's request, Waltz left the room, exiting through a second door leading back into the prison medical department.  (*Id.* at 84-85.)[2]  Dr. Russo then asked plaintiff to sign a medical malpractice waiver, explaining that he couldn't help him without it.[3]  (*Id.* at 85-86, 89.)  Plaintiff refused to sign the waiver and asked to be returned to his cell, and Dr. Russo told him he could do so.  (*Id.* at 87, 89-90.)

Following this exchange, Waltz re-entered the counseling room through the door to the medical department and began yelling at plaintiff, repeatedly asking him why he wouldn't sign the malpractice waiver.  (*Id.* at 90, 95.)  Waltz then told plaintiff, pointing to the door to the medical department, which was still open, "you can go through that door if you want, but you won't get out of prison."  (*Id.* at 90-91, 95.)  In response to Waltz's statement, plaintiff stood and proceeded to walk out the door to the medical department.  (*Id.* at 95-96.)  Plaintiff had taken about two steps through the door when, without telling him to stop or saying anything to him,

---

[2]The door to the medical department led to a second room which, in turn, led to a medical waiting area where, according to defendant Waltz, a number of pregnant female inmates were waiting to see the doctor on the day of the evaluation.  (Defs.' Ex. I ("Waltz Dep.") 99-100.)  Plaintiff characterizes the room immediately adjacent to the counseling room as a hallway, while defendant Waltz refers to it as a medical examination room; however, the parties agree that this intermediate room was empty on the day of the events at issue.

[3]Because his liability insurance was with another hospital at the time, Dr. Russo agreed to do the evaluation on the understanding that he would have to request that plaintiff sign a waiver of malpractice.  (Russo Dep. 17.)

Waltz came up behind him, grabbed him around the waist, picked him up off of his feet, and threw him to the ground. (*Id.* at 93, 96-101, 146.)[4] According to plaintiff, as he was throwing plaintiff to the ground, Waltz said that he shouldn't have told plaintiff to "go out that way" and that he would "kick [plaintiff's] ass." (*Id.* at 101, 146, 159.) Plaintiff hit the ground on his left side and then landed face up before Waltz rolled him over onto his stomach. (*Id.* at 98-101.) A group of "white shirts" then arrived, handcuffed plaintiff, and escorted him back to his cell where they "stripped [him] down" and took photographs of his back and bruising. (*Id.* at 101-02, 113.)[5]

Although defendants do not dispute that plaintiff "was taken to the ground" by Waltz after he attempted to leave the counseling room (Defs.' Statement ¶¶ 17, 20), they offer a competing account of the circumstances surrounding Waltz's actions. Dr. Russo testified that plaintiff became "very argumentative" during their meeting, ranting and raving and making "lots of threatening and hostile remarks." (Russo Dep. 19-20; *see also id.* at 20 (stating that plaintiff's "judgment was totally impaired" and that he was "[t]otally irrational, argumentative, loud ranting and raving").)[6] According to Waltz, as he was waiting outside the counseling room, plaintiff's voice got louder and louder, and when it became a little more aggressive in tone, Waltz re-entered the room and tried to convince plaintiff to cooperate with the evaluation. (Waltz Dep.

---

[4]Plaintiff estimated that the distance from the door to the counseling room to the door of the medical waiting area was approximately fifty to seventy-five feet. (*See* Pl.'s Dep. 96-97.) Plaintiff also testified that the door to the medical waiting area was closed at the time Waltz tackled him. (*See id.*)

[5]Plaintiff testified that the "white shirts" walked him back to his cell via the medical department rather than going back through the counseling room. (Pl.'s Dep. 119-20.)

[6]Plaintiff denies having raised his voice during his interaction with Dr. Russo. (Pl.'s Dep. 89.)

85, 97-98.)  At some point during the exchange, plaintiff stood up, opened the door to the medical department, and proceeded to walk across the room to the door leading to the medical waiting area.  (*Id.* at 86, 98-99.)  Waltz followed plaintiff, telling him several times to stop, but plaintiff continued to walk toward the door to the medical waiting area without responding.  (*Id.* at 86, 100-01.)  Once plaintiff got to the door of the medical waiting room, Waltz testified he "wrapped [his] arms around [plaintiff] and took him to the floor," falling to the ground himself in the process.  (*Id.* at 86, 100-01.)  While on the ground, Waltz instructed Dr. Russo to hit a panic button, and within a few seconds, several corrections officers came in, handcuffed plaintiff, and took him back to his cell.  (*Id.* at 86-87, 102.)

At his deposition, Waltz acknowledged that plaintiff made no verbal threats while leaving the counseling room, and that plaintiff could not have gotten more than twenty feet away had Waltz not intervened, given the presence of other security officers in the medical department. (Waltz Dep. 103, 105-06.)  However, Waltz testified that he was concerned that plaintiff could be a threat to the female inmates who were in the medical waiting area at the time, given his "irritated and upset and paranoid" frame of mind.  (*Id.* at 104-05, 131.)

As a result of the incident, plaintiff had pain and bruising in his left hip, right buttocks, and left elbow.  (Pl.'s Dep. 113-14, 192-93.)  The next day, on April 17, 2006, he was examined for abrasions to his left shoulder and pain in his left wrist.  (Defs.' Statement ¶ 22 & Ex. F (patient progress sheet for plaintiff); Pl.'s Counterstatement ¶ 22.)  According to medical records, plaintiff refused treatment for the shoulder abrasions, which were superficial, and he had full range of motion and no swelling in his wrist.  (Defs.' Statement ¶¶ 22-23 & Ex. F; Pl.'s Counterstatement ¶¶ 22-23.)  The medical records also reflect that plaintiff was told to ask to be

seen if the pain in his wrist continued.  (Defs.' Ex. F.)  Following the incident, plaintiff requested

medical attention for his injuries on April 21, 22, and 24, 2006, complaining on April 22 that his

hip continued to be "very painful" and his left wrist "very numb."  (Pl.'s Exs. I-K (Inmate

Requests for Medical Services).)  Plaintiff testified that it took three months for the deep bruising

in his hip to heal.  (Pl.'s Dep. 199.)  He also testified that the incident made him scared to take

drugs or to talk to counselors.  (*Id.* at 172.)

At the time of the incident with defendant Waltz, plaintiff was on house alone/block

alone ("HA/BA") status, which meant that he was permitted to be out of his cell only when other

inmates were in their cells and had to remain in his cell when other inmates were out of their

cells.  (Pl.'s Dep. 103, Pl.'s Ex. G ("LCP 30(b)(6) Dep.") 51-52, 54.)  Plaintiff had been placed

on HA/BA status the previous month for threatening other inmates and writing threatening letters

(Defs.' Statement ¶ 6; Pl.'s Counterstatement ¶ 6), and he apparently was not taken off HA/BA

status until July 2006, more than one hundred days later (Pl.'s Ex. M (July 8, 2006, email from

Carrie McWilliams stating that plaintiff "can be taken off HA/BA status"); *see also* Pl.'s Dep.

108, 171 (plaintiff's testimony that he remained on HA/BA status for a period of one hundred

days)).  Plaintiff testified that during this more than one hundred-day period, he was not

permitted to use the prison's urban yard despite his requests to do so.[7]  (*Id.* at 105-108.)  He

identified three corrections officers – officers Flagherty, Sutton, and Weaver – as the particular

individuals who would not allow him access to the urban yard during this time.  (*Id.* at 105-07.)

Although plaintiff did not mind being on HA/BA status, which protected him from being

_____

[7]Plaintiff described the urban yard as a high-ceilinged room with large screened windows
open to the elements.  (Pl.'s Dep. 106.)  Defendant Guarini testified that the urban yards are
exposed to the weather and are considered to be outside yards.  (LCP 30(b)(6) Dep. 60-61.)

harassed by other inmates, he did object to the lack of exercise outside of his cell and demanded to see a doctor about this issue.  (Defs.' Statement ¶ 7; Pl.'s Counterstatement ¶ 7; Pl.'s Dep. 135-36.)

Proceeding *pro se*, plaintiff commenced this civil action in January 2006.  Between May 2007, when plaintiff was granted leave to proceed *in forma pauperis*, and November 2007, plaintiff filed a complaint and two amendments thereto.  In his second amended complaint, plaintiff asserted claims against various defendants alleged to have been involved in his underlying criminal case and added Eighth Amendment claims against LCP and Waltz based on plaintiff's assault by Waltz and denial of access to exercise.  By order dated November 19, 2007, the court directed that LCP and Waltz be added as defendants in the case and dismissed the claims against all of the remaining defendants.  Plaintiff thereafter filed a motion for appointment of counsel, which the court granted, and counsel was appointed for plaintiff in June 2008.  In October 2008, plaintiff, by counsel, filed a third amended complaint, adding Warden Guarini as a defendant, and asserting claims pursuant to 42 U.S.C. § 1983 and state law arising out of the incident with Waltz and the denial of access to exercise.

## II.   Summary Judgment Standard

A motion for summary judgment must be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met this initial burden, the nonmoving party must "come forward with 'specific facts

showing that there is a *genuine issue for trial*.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."  *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 743 (3d Cir. 1996) (citation and internal quotation marks omitted).  The non-movant must present concrete evidence supporting each essential element of its claim.  *Celotex*, 477 U.S. at 322-23.

In evaluating a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed."  *Ideal Dairy Farms, Inc.*, 90 F.3d at 744 (citation and internal quotation marks omitted).  However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment."  *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990).  The non-movant must show more than "[t]he mere existence of a scintilla of evidence" for elements on which he bears the burden of production.  *Anderson*, 477 U.S. at 252.  Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587.

III.    **Discussion**

   A.    **Claims Based on Waltz's Use of Force Against Plaintiff**

The majority of plaintiff's claims arise out of defendant Waltz's use of force against him

8

as he attempted to leave the medical counseling room.  Plaintiff seeks to hold defendant Waltz liable under 42 U.S.C. § 1983 for excessive force in violation of the Eighth Amendment.  (3d Am. Compl., Count VI.)  He also sues Waltz under state law for assault, battery, gross negligence/willful misconduct, intentional infliction of emotional distress, and negligent infliction of emotional distress.  (*Id.*, Counts I-V.)

> **1.      § 1983 Claim for Excessive Force**

To prevail on a § 1983 claim, a plaintiff must show "a violation of a right protected by the Constitution or the laws of the United States committed by a person acting under the color of state law." *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 580-81 (3d Cir. 2003).  There is no dispute that Waltz was acting under color of state law at the time of the incident in question.  The issue, therefore, is whether plaintiff has produced sufficient evidence to show a violation of his rights under the Eighth Amendment.

In evaluating whether a particular use of force is constitutionally actionable, the "core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992).  The factors to be considered by the court in making this determination include: "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response." *Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009) (citing *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). "[I]f 'it appears that the evidence, viewed in the light most favorable to the plaintiff, will support

9

a reliable inference of wantonness in the infliction of pain,'" then summary judgment in favor of a defendant is not appropriate. *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000) (quoting *Whitley*, 475 U.S. at 322).

Addressing the factors cited above, defendants argue that they are entitled to summary judgment on plaintiff's excessive force claim because the force used by Waltz was *de minimis* as a matter of law. (Defs.' Mem. 6-8.) In particular, defendants assert that plaintiff's own misconduct created the need for application of force by Waltz; that the force used by Waltz was minimal and reasonable in relation to the need to regain plaintiff's compliance and to protect the safety of other inmates; that plaintiff's injuries were minimal; and that Waltz used force only as a last resort, after other efforts to gain plaintiff's compliance had failed. (*See id.* at 8.)

While defendants' account suggests that Waltz used force "in a good-faith effort to maintain or restore discipline," plaintiff's evidence, which the court must accept as true on a motion for summary judgment, suggests otherwise. Plaintiff testified that he exited the counseling room by the door to the medical department only after Waltz told him he could do so,[8] and he denied that Waltz told him to stop or said anything to him before taking him down. Moreover, while Waltz testified that he was concerned that plaintiff could be a threat to inmates in the medical waiting area in light of his agitated state at the time (Waltz Dep. 104-05, 131), plaintiff's testimony calls into question the reasonableness of Waltz's belief. At his deposition,

_____

[8]At his deposition, plaintiff testified that after re-entering the counseling room, Waltz stated, pointing to the open door to the medical unit, "[y]ou can go through that door if you want, but you won't get out of prison." (Pl.'s Dep. 91, 95.) Viewed in the light most favorable to plaintiff, this comment by Waltz reasonably can be interpreted as giving plaintiff permission to exit the counseling room via the medical department door. This interpretation is consistent with plaintiff's further testimony that while throwing him down, Waltz stated that he shouldn't have told plaintiff to "go out that way." (*Id.* 101, 146, 159.)

plaintiff denied having raised his voice during his encounter with Dr. Russo (Pl.'s Dep. 89), and

he claimed to have taken only two steps through the counseling room door before Waltz came

after him, placing him just under the full fifty- to seventy-five-foot distance to the closed

entrance to the medical waiting area at the time he was taken to the ground (*id.* at 93, 96-97).

Plaintiff also disputes that Waltz made any effort to stop him from leaving the counseling room

short of applying physical force.  (*See id.* at 93, 96, 146.)  Finally, although plaintiff's injuries as

a result of the incident with Waltz were not great,[9] even *de minimis* injuries "do not necessarily

establish *de minimis* force."  *Smith*, 293 F.3d at 649.

Defendants also rely on a series of cases in which particular uses of force have been

found to be insufficiently severe to rise to the level of an Eighth Amendment violation.  (Defs.'

Mem. 6-7.)  Although the Eighth Amendment does not protect inmates against "*de minimis* uses

of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of

mankind,'" *Hudson*, 503 U.S. at 9-10 (quoting *Whitley*, 475 U.S. at 327 (internal quotation marks

omitted)), the cases cited by defendants do not support the conclusion that the force at issue here

was *de minimis*.  In many of those cases, the court's holding was based not simply upon the

---

[9]Plaintiff vigorously disputes defendants' characterization of his injuries as minimal and limited to "a superficial abrasion for which he refused treatment."  (Defs.' Mem. 7-8; *see* Pl.'s Resp. to the Mot. for Summ. J. of Def. LCP and Def. Troy Waltz ("Pl.'s Resp.") 13-15.) Plaintiff testified to having injuries beyond the shoulder abrasion, including pain and bruising in left hip, right buttocks, and left elbow, and pain in left wrist.  (Pl.'s Dep. 113-14, 192-93.)  He continued to complain of pain in the days following the incident, and he testified that the bruising in his left hip took three months to heal.  (Pl.'s Ex. J (Inmate Request For Medical Services dated April 22, 2006); Pl.'s Dep. 199.)  Even as described by plaintiff, however, these injuries are not significantly different from injuries the Third Circuit has characterized as *de minimis*.  *See Smith v. Mensinger*, 293 F.3d 641, 645, 647 (3d Cir. 2002) (plaintiff's injuries from beating by prison guards included bleeding from his head; pain in his ribs, ears, and right eye; and bruising and redness in his ribs, which remained sore for a couple of weeks after the beating).

particular type of force at issue but on the context in which the force was applied, including the

plaintiff's own conduct in creating a situation in which some use of force was reasonably

necessary.[10]  Here, in contrast, the facts regarding plaintiff's compliance and the reasonableness

of Waltz's belief that he posed a threat to the security of other inmates are in dispute.  Moreover,

to the extent that the cases cited by defendants hold particular types of physical contact to be

constitutionally *de minimis*, they involve conduct less severe than that of defendant Waltz.[11]

While the Third Circuit has affirmed the grant of summary judgment on excessive force claims

involving allegations that a prisoner was tackled by corrections officers, it has done so only

where it is undisputed that the plaintiff created a need for the use of force by resisting or

disobeying corrections officers.  *See Hughes v. Smith*, No. 06-1479, 2007 WL 1885567, at *3 (3d

Cir. July 2, 2007) (force used by corrections officers, which included one officer's tackling of

---

[10]*See Camp v. Brennan*, 54 F. App'x 78, 80 (3d Cir. 2002) (use of stun gun did not present a cognizable Eighth Amendment claim where plaintiff had created the confrontation by refusing to walk through a doorway and force was reasonably necessary to regain control of plaintiff); *Wesley v. Dombrowski*, No. 03-4137, 2007 WL 2571525, at *12 (E.D. Pa. Aug. 31, 2007) (force applied by defendants in grabbing, picking up, dragging, dropping, and carrying plaintiff while taking him from dispensary back to his cell lacked the severity necessary to exceed the *de minimis* category "[w]hen viewed in the context in which each use of force occurred, including [plaintiff's] own behavior"); *Colon v. Wert*, No. 96-4494, 1997 WL 137172, at *1-*3 (E.D. Pa. Mar. 21, 1997) (plaintiff failed to establish that defendant's slamming of cell door into plaintiff's chest was "anything more than a *de minimis* use of force" where plaintiff conceded that defendant may not even have seen him standing in cell door).

[11]*See Thomas v. Ferguson*, 361 F. Supp. 2d 435, 441 (D.N.J. 2004) (characterizing force at issue as "three punches and two shoves . . . during an altercation"); *Acosta v. McGrady*, No. 96-2874, 1999 WL 158471, at *8-*9 (E.D. Pa. Mar. 22, 1999) (physical contact consisting of pulling sharply on plaintiff's handcuffed arms and slamming him into a wall for no reason); *Barber v. Grow*, 929 F. Supp. 820, 823 (E.D. Pa. 1996) (act of pulling a chair out from under plaintiff); *Robinson v. Link*, No. 92-4877, 1994 WL 463400, at *1 (E.D. Pa. Aug. 25, 1994) (force used in placing plaintiff in handcuffs, pulling him along corridor by his handcuffs, and hitting him); *Brown v. Vaughn*, No. 91-2911, 1992 WL 75008, at *1-*2 (E.D. Pa. Mar. 31, 1992) (punching plaintiff once in the chest and spitting on him).

plaintiff, was not excessive "[b]ecause [plaintiff] admitted to resisting and 'scuffling' with [one of the correction officer defendants]"); *Smith v. Hulick*, No. 97-801, 1998 WL 84019, at *3 (E.D. Pa. Feb. 25, 1998) (finding that corrections officer's punch, chase, and tackle were a reasonable attempt to restore discipline where plaintiff admitted that he disobeyed officer's order to enter a bathroom/enclosed area to wait and instead began to walk quickly away in another direction), *aff'd*, 208 F.3d 206 (3d Cir. 2000) (unpublished table decision).  Tackling that is "unprovoked and unnecessary, and not done in a good faith effort to maintain or restore discipline" may violate the Eighth Amendment.  *See Jackson v. Austin*, 241 F. Supp. 2d 1313, 1318-19 (D. Kan. 2003) (holding corrections officers liable for excessive force for tackling, cuffing, and dragging plaintiff in circumstances where there was no need to apply force at all).

Plaintiff has presented evidence that after telling him he could exit the counseling room by the door to the medical unit, Waltz came after him, picked him up, and threw him to the ground without first telling him to stop and when he was only two steps out the door, almost the full length of the room away from the closed entrance to the medical waiting area.  Accepting plaintiff's evidence as true, as I must for this purpose, and drawing all reasonable inferences therefrom in plaintiff's favor, a jury reasonably could conclude that Waltz's use of force was neither provoked nor justified but was entirely gratuitous.  Plaintiff's evidence supports "'a reliable inference of wantonness in the infliction of pain;'" hence, summary judgment in favor of defendants is not appropriate.  *Brooks*, 204 F.3d at 106 (quoting *Whitley*, 475 U.S. at 322).

Defendants also contend that Waltz is entitled to qualified immunity as to plaintiff's excessive force claim.  The court already has addressed the first part of the qualified immunity analysis, having determined that, viewed in the light most favorable to plaintiff, the record

13

evidence shows a violation of plaintiff's Eighth Amendment rights.  *See Saucier v. Katz*, 533

U.S. 194, 201 (2001).  Accordingly, the court must proceed to determine whether the right

violated was "clearly established."  *See id.*[12]  For a right to be clearly established for purposes of

qualified immunity, "'[t]he contours of the right must be sufficiently clear that a reasonable

official would understand that what he is doing violates that right.'" *Id.* at 202 (quoting *Anderson*

*v. Creighton*, 483 U.S. 635, 640 (1987)).  The "relevant, dispositive inquiry" is "whether it would

be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id.*

     Although defendants argue that Waltz "clearly had 'substantial grounds for . . .

concluding that he had legitimate justification under the law for acting as he did'" (Defs.' Mem.

9), they disregard entirely plaintiff's version of events in describing the "situation [Waltz]

confronted."  In particular, defendants assert that plaintiff was "argumentative, irrational and

ranting and raving" following his meeting with Dr. Russo, and that Waltz took plaintiff to the

ground only after plaintiff failed to heed Waltz's repeated command that he stop.  (*Id.*)  As noted

above, however, factual disputes exist both as to plaintiff's demeanor and as to whether Waltz

made any effort to stop plaintiff from walking out of the counseling room short of using physical

force.  These factual issues are material to whether "the situation [Waltz] confronted" warranted

the use of any force at all and whether the force used by Waltz was gratuitous.  According to

plaintiff, whose evidence must be believed at the summary judgment stage, he never raised his

voice in the counseling room, and Waltz never told him to stop, but instead told him he could

---

    [12]The Supreme Court recently held that the sequence of the two-pronged qualified
immunity analysis set forth in *Saucier* is no longer mandatory and that trial courts now have
discretion to determine which of the two prongs of the analysis to apply first.  *See Pearson v.
Callahan*, __ U.S. __, __, 129 S. Ct. 808, 818 (2009).

leave by the door to the medical department.  In these circumstances, no reasonable officer could

have perceived a need "to maintain or restore discipline," and no reasonable officer could have

believed it was lawful to come after plaintiff, pick him up off of his feet, and throw him to the

ground.  *See Hudson*, 503 U.S. at 7 (core judicial inquiry on an excessive force claim is "whether

force was applied in a good-faith effort to maintain or restore discipline, or maliciously and

sadistically to cause harm"); *Giles*, 571 F.3d at 326 (noting established law that "an officer may

not . . . use gratuitous force against an inmate who has been subdued"); *Hill v. Shelander*, 992

F.2d 714, 717-18 (7th Cir. 1993) (reasonable prison official should reasonably have known that

unprovoked assault on prisoner in absence of any need to use force in order to maintain or restore

discipline would violate the Eighth Amendment).  Because factual disputes preclude entry of

summary judgment for defendant Waltz on the basis of qualified immunity, the court will deny

defendants' motion for summary judgment as to Count VI to the extent that it asserts a claim for

excessive force.[13]

### 2.    Claims Under Pennsylvania Law

In addition to his § 1983 claim, plaintiff also asserts common law claims for assault,

battery, gross negligence/willful misconduct, intentional infliction of emotional distress, and

---

[13]Although Count VI is asserted against "All Defendants," plaintiff does not suggest (and presents no evidence suggesting) that defendant Guarini had any personal involvement in the incident with Waltz.  *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) ("A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*.").  And plaintiff acknowledges in his summary judgment papers that he is no longer pursuing his claim for inadequate training and/or supervision with respect to the alleged assault by Waltz.  (*See* Pl.'s Resp. 23-24 (acknowledging that "discovery has not bourne . . . out" allegations that "a lack of training and supervision was a proximate cause of the injuries that resulted from Waltz's assault").)  Consequently, the motion for summary judgment will be granted on this claim as to defendants Guarini and LCP.

negligent infliction of emotional distress against Waltz alone arising out of Waltz's use of force against him.  (*See* 3d Am. Compl., Counts I-V.)

*Assault and Battery (Counts I & II)*

With respect to plaintiff's claims for assault and battery, defendants argue that Waltz cannot be liable because his use of force was reasonable under the circumstances and is therefore privileged.  (Defs.' Mem. 9-11.)  Defendants rely primarily on *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994), in which the Pennsylvania Supreme Court observed that a police officer "may use reasonable force to prevent interference with the exercise of his authority or the performance of his duty" and, in making a lawful arrest, "may use such force as is necessary under the circumstances to effectuate the arrest."[14]  As the *Renk* court recognized, however, it is "[t]he reasonableness of the force used in making the arrest" that determines "whether the police officer's conduct constitutes an assault and battery.  . . .  A police officer may be held liable for assault and battery when a jury determines that the force used in making an arrest is unnecessary or excessive . . . ."  *Id.*  For the reasons stated in Part III.A.1. above, as well as the fact that Waltz does not claim he was making an arrest, factual disputes as to the circumstances surrounding Waltz's use of force against plaintiff preclude the court from concluding that the force used was reasonable as a matter of law; therefore, summary judgment will be denied as to Counts I and II.

*Gross Negligence/Willful Misconduct (Count III)*

Waltz argues that Count III must be dismissed because, to the extent that it asserts a claim for gross negligence, Waltz is entitled to immunity under the Pennsylvania Political Subdivision

---

[14]A similar privilege applies in the prison context.  *See Picariello v. Fenton*, 491 F. Supp. 1026, 1038 (M.D. Pa. 1980) ("[O]fficials charged with the custody of prisoners are privileged to use force which is reasonable under the circumstances to maintain control of their charges.").

Tort Claims Act, 42 Pa. Cons. Stat. § 8541 et seq. ("PPSTCA").  (Defs.' Mem. 4-5.)  Although

plaintiff agrees that he cannot establish a gross negligence claim, he argues that summary

judgment should not be entered because Count III also asserts a claim for willful misconduct,

which Waltz's motion does not address.  (Pl.'s Resp. 11; *see also* 3d Am. Compl., Count III.)

Because Waltz does not contend that he is entitled to immunity with respect to plaintiff's willful

misconduct claim and does not offer any alternative basis for dismissal of Count III, the court

will deny Waltz's summary judgment motion as to that count to the extent that it asserts a claim

for willful misconduct.  *See Brown v. Muhlenberg Twp.*, 269 F.3d 205, 214 (3d Cir. 2001)

(noting that the PPSTCA "denies immunity to any public employee when the court finds that his

or her conduct constitutes, among other things, 'willful misconduct'").  To the extent that Count

III asserts a claim for gross negligence, however, the motion will be granted.

     *Intentional Infliction of Emotional Distress (Count IV)*

     Summary judgment must be granted as to plaintiff's claim for intentional infliction of

emotional distress because plaintiff has failed to produce any "objective proof of severe

emotional distress," as required under Pennsylvania law.  *Kazatsky v. King David Mem. Park,*

*Inc.*, 527 A.2d 988, 995 (Pa. 1987); *see also Bougher v. Univ. of Pittsburgh*, 882 F.2d 74, 80 (3d

Cir. 1989) ("Pennsylvania requires that competent medical evidence support a claim of alleged

intentional infliction of emotional distress.").  The only evidence plaintiff cites to support the

allegation in his complaint that "Waltz's conduct caused severe emotional distress" (3d Am.

Compl. ¶ 53) is his own deposition testimony that the incident with Waltz made him "scared to

take drugs and . . . scared to talk to counselors" (Pl.'s Dep. 172).  This evidence falls far short of

the proof required under Pennsylvania law; therefore, the court will grant Waltz's motion as to

Count IV.  *See Kazatsky*, 527 A.2d at 992, 995 (plaintiffs could not recover for intentional

infliction of emotional distress where the only evidence of their alleged injuries consisted of their

own averments unsubstantiated by competent medical evidence).

> *Negligent Infliction of Emotional Distress (Count V)*

Plaintiff concedes that he cannot establish a claim for negligent infliction of emotional

distress (Pl.'s Resp. 13); therefore, the court will grant defendants' motion for summary

judgment as to Count V of the complaint.

### B.   Denial of Outdoor Exercise

Plaintiff's remaining claims (Counts VI (in part), VII, and VIII) concern the denial of

access to outdoor exercise while he was on HA/BA status between March and July of 2006.

Plaintiff asserts that the complete denial of outdoor exercise during this period of more than one

hundred days violates the Eighth Amendment, a violation for which he contends all three

defendants are liable under 42 U.S.C. § 1983.  (*See* 3d Am. Compl., Counts VI & VII.)[15]  He also

asserts a § 1983 claim for inadequate training and/or supervision against defendants Guarini and

LCP, challenging their failure to adopt adequate written policies regarding HA/BA status and

access to outdoor exercise.  (*See* 3d Am. Compl., Count VIII; Pl.'s Resp. 24-26.)

---

[15]In Count VII of the complaint, plaintiff also alleges that the denial of outdoor exercise violates 61 Pa. Stat. Ann. § 101, which, at the time of the events in question, specified the minimum daily amount of physical exercise to be provided to prisoners.  Although Count VII appears to assert a claim under this statute (*see* 3d Am. Compl. ¶¶ 68-69 (asserting denial of plaintiff's rights under 61 Pa. Stat. Ann. § 101 and seeking, among other relief, "[a] declaration that Defendants' actions violated Plaintiff's state and federal rights")), the parties do not address Count VII as a claim under state law in their summary judgment papers.  Rather, plaintiff opposes the entry of summary judgment as to Counts VI and VII on the sole basis that he has made a sufficient showing of an Eighth Amendment violation.  (*See* Pl.'s Resp. 18-23.)  Because plaintiff appears to treat Count VII as an Eighth Amendment claim, the court will do the same.

For claims alleging that prison conditions violate the Eighth Amendment, the plaintiff must show (1) a deprivation that is, "objectively, 'sufficiently serious,'" *i.e.*, that "result[s] in the denial of 'the minimal civilized measure of life's necessities,'" and (2) that the responsible prison officials acted with "'deliberate indifference' to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citations omitted).  To be liable under § 1983, the defendant "must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*." *Rode*, 845 F.2d at 1207.

Because plaintiff has failed to produce any evidence suggesting that either defendant Waltz or defendant Guarini had the requisite "personal involvement" in denying him access to outdoor exercise while on HA/BA status, the court must dismiss Count VI, to the extent that it concerns the denial of access to outdoor exercise, and Count VII.[16]  Plaintiff does not suggest that either Waltz or Guarini personally denied him access to the urban yard.  To the contrary, at his deposition, plaintiff identified three other corrections officers – Flagherty, Sutton, and Weaver – as the individuals who would not allow him to use the urban yard despite his requests to do so, and he testified that he did not ask anyone else to use the urban yard during the relevant time frame.  (Pl.'s Dep. 105-07.)  Although personal involvement also can be shown through evidence of "personal direction or of actual knowledge and acquiescence," *Rode*, 845 F.2d at 1207, there is no evidence that either Waltz or Guarini knew that plaintiff was being denied exercise, much less

---

[16]The court also must dismiss Counts VI and VII against LCP, a governmental entity that may be found liable under § 1983 only for injuries caused by a governmental policy or custom. *See Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403 (1997).

that they directed any such denial.[17]  Plaintiff complained about his inability to exercise outside

of his cell in an April 2006 request for medical services (*see* Pl.'s Ex. N (Inmate Request for

Medical Services dated April 10, 2006)), but there is no evidence that either Waltz or Guarini

was or should have been aware of this complaint.  Because neither of the individual defendants

before the court was personally involved in denying plaintiff access to the urban yard, the court

will grant the defendants' summary judgment motion as to Counts VI, to the extent that it asserts

a claim for denial of exercise, and VII.

Defendants argue that because plaintiff has failed to produce evidence sufficient to

support an underlying constitutional violation by Waltz or Guarini, there is no basis for imposing

liability for failure to train/supervise.  (Defs.' Mem. 13.)  Although defendants are correct that

plaintiff must show that his Eighth Amendment rights were violated in order to recover against

LCP, the responsible official need not be before the Court.  *See Natale*, 318 F.3d at 581-85

(considering whether unidentified employees of prison health services provider had violated

plaintiff's Eighth Amendment rights before proceeding to determine whether provider could be

liable for such violations based on its failure to establish a policy on the relevant issue).  Rather,

it is enough to show that some LCP employee committed the violation alleged.  *See id.*  Even

assuming that plaintiff has sufficiently demonstrated that LCP employees violated his Eighth

Amendment rights by denying him access to exercise, however, the court must nevertheless

dismiss Count VIII because plaintiff has failed to show that any failure to act by LCP and Guarini

---

[17]At his deposition, plaintiff testified that Waltz was responsible for keeping him on HA/BA status for at least some portion of the March to July time frame (*see* Pl.'s Dep. 110), but he did not suggest that Waltz played any role with respect to denying him access to outdoor exercise.

amounts to deliberate indifference.

To impose liability on a governmental entity under § 1983, a plaintiff must "identify a [governmental] 'policy' or 'custom' that caused the plaintiff's injury." *Bryan County*, 520 U.S. at 403. Governmental inaction may rise to the level of a policy or custom that is actionable under § 1983, but only in those limited circumstances in which the failure to act amounts to deliberate indifference to the rights of persons with whom government employees come into contact. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989) (addressing municipal liability for failure to train). In such cases, the plaintiff must show that "the need for more or different training [or policies] is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390; *Brown*, 269 F.3d at 216. The plaintiff also must demonstrate "a direct causal link" between the governmental inaction and the deprivation of federal rights. *Bryan County*, 520 U.S. at 404.

Although Count VIII of plaintiff's complaint is captioned as a claim for "Inadequate Training and/or Supervision" (3d Am. Compl., Count VIII), in his summary judgment papers, plaintiff focuses primarily on the lack of adequate written *policies* regarding outdoor exercise and HA/BA status (Pl.'s Resp. 24-26). Plaintiff contends that the lack of such adequate written policies makes "HA/BA status ripe for abuse by corrections officers and other LCP personnel and, in this case, directly resulted in Plaintiff's being denied access to outdoor exercise for a period of over 100 days." (*Id.* at 25.) To support this claim, plaintiff relies entirely on defendant Guarini's testimony that LCP has no written policy on HA/BA status or exercise.[18] (Pl.'s Resp.

---

[18]Testifying as LCP's Rule 30(b)(6) representative, defendant Guarini stated that he was not aware of any policies on HA/BA other than the one-page PowerPoint presentation defendants produced in response to plaintiff's discovery requests. (LCP 30(b)(6) Dep. 54.) The PowerPoint

21

24-25.)  As plaintiff acknowledges, however, defendant Guarini, testifying as LCP's Rule

30(b)(6) representative, stated that inmates on HA/BA status are allowed out of their cells for one

to two hours each day and are allowed to exercise and to use the urban yard by themselves.[19]

(LCP 30(b)(6) Dep. 55-56, 90.)  Moreover, after confirming that there are no written policies

about exercise, defendant Guarini added, "[i]t's in the handbook," suggesting that guidance on

the issue was available elsewhere.  (*See id.* at 90-91.)[20]

        In light of this testimony regarding what plaintiff himself characterizes as "LCP's

standard practices" regarding inmate exercise (*see* Pl.'s Resp. 23), the court finds that a

reasonable trier of fact could not conclude that the need for a written policy was so obvious and

the lack of a policy so likely to result in HA/BA status prisoners being denied all access to

outdoor exercise as to amount to deliberate indifference on the part of LCP and defendant

Guarini to plaintiff's constitutional rights.  *See Brown*, 269 F.3d at 216 (affirming grant of

summary judgment on claim challenging municipality's failure to train police officers in

handling dogs where officers had guidance of policy manual, finding that "a reasonable trier of

---

presentation outlines the circumstances in which HA/BA status is imposed and the categories of
individuals authorized to impose it.  (*See* Pl.'s Ex. P (PowerPoint presentation).)

        [19]Plaintiff suggests that defendant Guarini, at his deposition, "provided evasive answers
to questions regarding privileges afforded to inmates in HA/BA status," demonstrating "an
overall lack of routine and standard operating procedure for dealing with inmates in HA/BA."
(Pl.'s Resp. 25.)  The court notes that it is not clear that plaintiff's characterization of Guarini's
testimony is correct, but in any event, Guarini was not evasive when asked about HA/BA
inmates' out-of-cell time and access to exercise.  (LCP 30(b)(6) Dep. 55-56, 90.)

        [20]Plaintiff does not point to any evidence regarding the training LCP personnel receive
regarding inmate exercise, and the court is not aware of any.  Defendant Guarini testified that the
initial training LCP corrections officers receive covers what HA/BA status is and the difference
between being on and not being on HA/BA status.  (*See* Pl.'s Ex. Q ("Guarini Dep.") at 37-38.)

fact could not conclude that the need for further guidance was so obvious as to indicate deliberate indifference"); *Reitz v. County of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997) (a reasonable jury could not conclude that County's failure to train prosecutors regarding the handling of property seized in forfeiture proceedings amounted to deliberate indifference where plaintiff presented no evidence that similar misconduct by prosecutors had occurred in the past); *cf. City of Canton*, 489 U.S. at 390 n.10 (suggesting that a failure to train may amount to deliberate indifference where police officers, in exercising discretion, "so often violate constitutional rights that the need for training must have been obvious to city policymakers"). Likewise, plaintiff has presented no evidence that the failure to adopt a written policy caused the denial of access to outdoor exercise in plaintiff's case. Accordingly, the court will grant defendants' motion for summary judgment as to Count VIII.

## IV.    Conclusion

For the reasons set forth above, the court will grant defendants' motion for summary judgment as to Counts IV, V, VII, and VIII, and will deny the motion as to Counts I and II. As to Counts III and VI, the court will grant the motion in part and deny it in part. Plaintiff may continue to pursue Count III to the extent that it asserts a claim for willful misconduct against defendant Waltz and Count VI only to the extent that it asserts a § 1983 claim for excessive force against defendant Waltz. The court will grant the motion for summary judgment as to Count VI as to defendants Guarini and LCP. An appropriate order accompanies this memorandum.